## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ROXIE VONLINTEL,               )
                               )
                    Plaintiff, )
                               )          CIVIL ACTION
v.                             )
                               )          No. 14-4125-KHV
EAGLE COMMUNICATIONS, INC.,    )
                               )
                    Defendant. )
_____)

## MEMORANDUM AND ORDER

Roxie VonLintel filed suit against her former employer Eagle Communications, Inc. Plaintiff asserts claims for age discrimination and retaliation under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") and the Kansas Age Discrimination in Employment Act ("KADEA"), K.S.A. § 44-1001 *et seq.* This matter is before the Court on Defendants' Motion For Summary Judgment (Doc. #55) filed October 7, 2015. For reasons stated below, the Court sustains defendant's motion.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on the pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

"[W]e must view the record in a light most favorable to the parties opposing the motion for summary judgment." Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. Anderson, 477 U.S. at 250-51. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

### Factual Background

The following material facts are uncontroverted, deemed admitted or, where disputed, viewed in the light most favorable to plaintiff, the non-movant.

From June of 1998 to April 9, 2014, Roxie VonLintel worked for Eagle Communications,

Inc. ("Eagle") as the Human Resources ("HR") Director and administrator of Eagle's Employee Stock Ownership Plan ("ESOP").[1]  During most of her tenure, plaintiff was the only person in the HR department and handled numerous functions including (1) managing payroll, personnel, employee benefits, the 401k plan and workers compensation; (2) managing, monitoring and reporting on the ESOP; and (3) notifying management as needed on issues of discrimination, harassment and other HR or legal matters.  On April 9, 2014, at the age of 66, plaintiff left her job. Defendant waited a week to give plaintiff time to return to work, but she did not return.  Plaintiff asserts that Eagle constructively discharged her; Eagle maintains that she voluntarily left her job.

Eagle has a board of directors consisting of Bob Schmidt, Gary Shorman, Kurt David, Joseph Jeter and Ken Braun.  Shorman, who is 59 years of age, is the Chief Executive Officer ("CEO"). David, who is 53 years of age, is the Chief Operating Officer.  When plaintiff started at Eagle, she reported to Shorman and Schmidt.  After Schmidt retired, Shorman became Eagle's CEO.  Around 2009, plaintiff started to report to David.

According to plaintiff, only Shorman and David treated her in a discriminatory manner.[2]  At some point after 2007, David asked plaintiff how he could get rid of two employees who were resistant to changes at one of Eagle's radio stations.  Plaintiff explained that because the employees were over 60 years of age, Eagle should put the employees on a performance enhancement plan and give them another chance to accept the changes. David dropped the subject and never asked plaintiff

---

[1]     Eagle is a Kansas corporation.  It offers radio broadcasting, cable/digital television distribution, high-speed Internet, wireless Internet and digital phone services as well as e-business solutions.  Since 2012, Eagle has been entirely employee-owned through the ESOP.

[2]     Throughout her employment, no Eagle employees ever complained to plaintiff that Shorman or David had discriminated against them due to age or had made demeaning comments about their age.

to take any further action.  When plaintiff left Eagle in April of 2014, both employees were still working at the company.  One retired in late 2014 and the other still works for Eagle.

Around 2012, when Shorman was reviewing health insurance utilization reports, he told plaintiff that if Eagle had younger employees, its employees would not have the same age-related illnesses such as heart disease.  Plaintiff stated that younger employees have claims when they have babies.  Shorman and plaintiff then talked about the benefits of having everyone be healthy. Plaintiff never thought that Shorman intended to make any employment decision based on insurance utilization.

During plaintiff's employment, Eagle grew dramatically from some 100 employees in 1998 to some 275 employees when plaintiff left in 2014.  In 2012, Eagle started a succession planning process to sustain the company through 2020 and beyond.  As part of the process, Eagle evaluated personnel, technology, facilities and potential acquisitions.

On August 3, 2012, David asked plaintiff and seven other employees who reported directly to him to email him before the October Year End Planning Meeting a written response on the following subjects: (1) what should we be doing to prepare for 2020; (2) how should workflow and responsibilities change; (3) what types of people should we be looking for; (4) how should we cross-train your current responsibilities; and (5) where do you want to be in eight years? Exhibit 11 to Defendant's Memorandum (Doc. #55).  In plaintiff's response on October 24, 2012, she stated that she was aware of her inevitable and eventual retirement.   Exhibit 12 to Defendant's Memorandum (Doc. #55).  She stated that it was hard to put a precise time frame on her retirement, but that it could "generally be anywhere from 24 months to 72 months or longer."  Id.  Plaintiff proposed that shortly before retirement, she would work part time while she transferred certain

payroll responsibilities to Barb Ellegood and trained whoever Eagle selected as her successor for HR issues.[3]  Others who reported to David responded with their own plans for the year 2020, but plaintiff did not know if anyone else responded.  Plaintiff also sent David an e-mail of other HR issues to consider in planning for the year 2020.  Plaintiff discussed potential labor shortages as baby boomers retired, the potential lack of qualified and highly skilled candidates, the need to prepare managers and supervisors for a multi-generational staff, the effects of increased use of technology and related HR issues.

Beginning in October of 2012, Eagle asked plaintiff and some 11 management employees to prepare a plan so that the company was ready for the year 2020.  The questionnaire asked several questions including "How old will you be in year 2020?" and "What will your sales team look like?"  Exhibit 12 to Plaintiff's Response (Doc. #60).  Plaintiff did not know what Eagle did with her plan or if others were participating in succession planning.  Jerry Hinrikus (who will be 70 years of age in 2020) responded that the sales team in 2020 should be "young, hungry, and better trained."  Id. Ed Klimek (who will be 69 years of age in 2020) responded that for his replacement, Eagle needs to "identify or recruit quality young people, need to get younger people in our organization, we are an aging company."  Id.  Mark Trotman (who will be 63 years of age in 2020) responded that the sales team in 2020 "will be younger and digitally savvy."  Id.  During a Year 2020 planning meeting with multiple employees including plaintiff, David said that everyone needed to realize that they would not be working at Eagle forever and that they needed to be thinking about their replacements.

In late 2012, Eagle management, its accountant, lawyer and ESOP adviser decided to convert

---

[3]      Ellegood began working at Eagle in 2002 and is currently 53 years of age.  She is currently Eagle's Accounting Analyst and Payroll Administrator.

the ESOP from a C corporation to an S corporation.  On November 5, 2012, plaintiff e-mailed Jeff Dinkel at VSR Financial Services about the conversion – including the goal to complete necessary paperwork by December 15, 2012 – and an inquiry whether the 401k Plan would remain fully compatible with the S Corporation.  Exhibit 18 to Defendant's Memorandum (Doc. #55).  In the email, plaintiff stated that the conversion discussion "is not common knowledge at this time."  Id. at 7.  Dinkel forwarded the inquiry to Laura Bailine at Acensus Client Services the same day. Bailine later sent plaintiff and Dinkel the form necessary to amend the 401k plan.  On December 8, 2012, by e-mail, David asked plaintiff for Social Security numbers related to the Sub-S conversion. In response, plaintiff did not indicate any surprise that the Sub-S conversion was in process.  On December 20, 2012, plaintiff e-mailed an outside entity and forwarded signed forms on the conversion to a Sub-S.  Until late 2013, plaintiff did not complain that Eagle had excluded her from the process of converting the ESOP to a Sub-S corporation.

On June 15, 2013, plaintiff verbally complained to Shorman about his comments at a meeting when plaintiff, Shorman and David made an ESOP presentation to the office in Hutchinson, Kansas. During the presentation to some 20 employees, Shorman said that for Eagle to remain successful, it needed new ideas and to have new and younger employees.  Shorman said that if older employees felt like they were just bench warming and waiting for retirement, they should leave and get a different job.  When Shorman made the comments, he looked at plaintiff several times.  Plaintiff felt that Eagle was targeting her and was embarrassed.  Plaintiff knew that most of the employees in Hutchinson were in the protected age category.  None of the employees ever complained about Shorman's comments.  On the way back from Hutchinson, when only plaintiff and Shorman were in the car, plaintiff told him that she was offended by his comments.  Plaintiff told Shorman that she

felt that she was being targeted and that he should not make such statements.  Shorman did not respond.  Plaintiff attended a later ESOP meeting in Hays, and does not recall that Shorman made any comment that she found offensive.  Plaintiff did not report her offense to Shorman's comments to anyone else at Eagle.

In August of 2013, an employee reported to plaintiff that the company's marketing manager was purchasing hats, uniforms and other items from the business of the employee's husband. Plaintiff called a meeting of Shorman, David and Galen Pfeifer, the company's outside CPA, to discuss the potential conflict of interest.  Before calling the meeting, plaintiff did not talk to the marketing manager's supervisor about the issue.  At the meeting, Shorman and David said they would look into plaintiff's concern.  After the meeting, David told plaintiff that she should never have called the meeting and that it got everyone upset.  Plaintiff thought that David essentially went ballistic and was verbally abusive to her.[4]  Plaintiff complained to Pfeifer about the incident.

In the fall of 2013, at a meeting with employees, Shorman stated that to continue being a successful company, Eagle would need younger employees.  Shorman stated by the age of 65, employees should be thinking about retirement and have their replacements lined up.  In response, Tammy Manley, a regional sales manager, said to plaintiff, "I've only got five more years left." Plaintiff Depo. at 173.  Plaintiff responded that at least you have five years, "I don't have any."  Id. Plaintiff did not make any complaint about Shorman's remarks.  No one else who attended the meeting ever complained that they thought Shorman's comments were discriminatory.

Eagle did not include plaintiff in the job interviews of Matt Moody, Stan Unruh, Kara

---

[4]      Plaintiff does not allege that David made any comments about age during this conversation.

Denton and Ron Fields.  Moody started working at Eagle in March of 2011 as Web and Social Media Director.  Unruh started on February 1, 2013.  Denton started on July 1, 2013 as Financial Controller for the Broadband division.  Fields started on December 16, 2013 as News and Information Director.  Throughout their employment, plaintiff did not supervise Moody, Unruh, Denton or Fields.  Even before Eagle hired Moody in 2011, plaintiff had not participated in interviews of all candidates.  Plaintiff never complained to Shorman or David that Eagle had excluded her from applicant interviews.  In late November of 2013, however, plaintiff told both of them that she was surprised that they were conducting interviews for the News and Information Director position because she was not aware that they had scheduled interviews.

Until October of 2013, plaintiff was in charge of checking references of employee applicants and she was the "designated employee representative" to receive and read drug test results.[5]  Eagle originally used TMHC to do drug tests, but the company did not do background checking.  In October of 2013, Shorman discussed with Shannon Ellenberger, who was an Employee Communications/Relations Administrator, about hiring a contractor to conduct both drug testing and employee background checks.[6]  Eagle had not previously done background checks on applicants.  Shorman asked Ellenberger to attend a seminar by NATSB, a contractor that could do drug testing, background checks and I-9 verification.  Ellenberger was unable to attend so Shorman asked plaintiff to do so.  Plaintiff did so and gave Ellenberger the seminar information.  A couple of

---

[5]     Plaintiff was not involved in any other part of the drug testing regimen such as collecting specimens.  Eagle started drug testing in approximately 2006.  No employee tested positive so plaintiff had never been involved in disciplinary action based on a failed drug test.

[6]     Eagle had originally hired Ellenberger as a customer service representative in March of 2010.

months later, Ellenberger told plaintiff that she was going to handle drug testing and background checks through NATSB.[7]

In October of 2013, plaintiff asked David if the company was pushing her out because of her age and in retaliation for prior complaints. Plaintiff Depo. at 69, 183. Plaintiff told David that Eagle had taken away some of her job duties, had "eliminated and excluded [her] from some of the processes" and that Shorman had made comments about age and younger employees. Id. at 69, 182-84. David asked plaintiff when was the last time that Eagle had fired or dismissed an older employee. Plaintiff could not think of any such employees, but later remembered that Eagle had let go of "quite a few" older employees. Id. at 185. David also said to plaintiff, "[W]hy would we want to get rid of you? You are supposed to be training [Ellenberger]. I want [Ellenberger] to be exactly like you." Id. at 186. Plaintiff knew that David intended the statement as a compliment, but she did not take it that way. David also told plaintiff that because of company growth and to prepare a succession plan for HR, they needed to train and mentor another person to provide backup and assistance for her job duties. David assured plaintiff that management was not trying to push her out and that they wanted her to be part of Eagle as long as she wanted to be there.

In November or December of 2013, several employees at one of Eagle's radio stations in St. Joseph, Missouri notified plaintiff that the station manager and sales manager had marginalized and demeaned them. Shorman told plaintiff that the station manager would handle the situation and that she should forward all emails about the situation to David and Gorman. Plaintiff had no supervisory authority over the St. Joseph radio station. Shorman said that he wanted Gary Exline, the station manager in St. Joseph, to handle the situation – unless plaintiff wanted to "live down there."

---

[7]   Shorman made the decision to use NATSB rather than TMHC.

Plaintiff told Shorman that she thought she was being targeted because they did not allow her to handle the complaints at the St. Joseph facility.

In December of 2013, David determined that in light of the company's growth, Eagle should add an HR employee. Shorman and David thought that Ellenberger had performed well in her prior positions and that to assist plaintiff, her role could be expanded in HR. In December of 2013 and January of 2014, David talked to plaintiff about having Ellenberger work on certain HR matters. David proposed to assign Ellenberger to be the primary HR contact for employees in the broadband division and the primary HR resource on the company's health and 401k plans (either for the entire company or limited to employees in the broadband division). David proposed that Ellenberger's new title be HR Specialist. Plaintiff objected to the new title so David changed Ellenberger's title to HR Assistant.[8] Plaintiff also was upset that Eagle proposed to assign HR duties to Ellenberger. She told David that Ellenberger was not qualified to be in HR.[9] Plaintiff further objected because Ellenberger would report to Shorman and David, and not to her. Plaintiff complained that Eagle essentially was demoting her by removing certain HR responsibilities and not giving her supervisory power over Ellenberger. Plaintiff contended that she would be personally liable if Ellenberger did not perform her assigned tasks satisfactorily. In January of 2014, plaintiff again complained to David that she was being pushed out of her position and that she was being targeted.

Before January of 2014, plaintiff was the primary HR resource for the entire company, with responsibility for all matters related to health insurance and the 401k plan. In January of 2014, Eagle assigned Ellenberger the following tasks: (1) starting immediately, to be the primary HR

---

[8]     Ellenberger also worked as an Employee Communications/Relations Administrator and even after assuming various HR duties in January of 2014, she retained that title.

[9]     David himself questioned how quickly Ellenberger could assume certain HR tasks.

resource for new employees in the broadband division; (2) by June of 2014, to become the primary HR resource on the 401k plan for all employees in the broadband division; (3) by October of 2014, to become the primary HR resource on health insurance for all employees in the broadband division and (4) by December of 2014, to become the primary HR resource in all HR areas (other than payroll) for all employees in the broadband division. Doc. #61-6. Although Ellenberger was to perform additional HR functions, she still reported to David as she had since April of 2011.

In early 2014, Ellenberger and Andrea Clinkscales worked on developing an employee portal, which would include various forms such as those used for scheduling vacation or using FMLA leave. Eagle did not consult plaintiff in determining where to place HR documents on the portal.

In early 2014, plaintiff asked David if she could attend an HR seminar in March of 2014. David asked plaintiff to provide a written explanation of why she wanted to attend. Plaintiff prepared a written explanation, but she never gave it to David. When Ellenberger had asked management to attend an HR seminar, management also asked her to justify the expense. Eagle also required other employees to justify attendance at outside seminars.

Around April 1, 2014, as part of plaintiff's performance evaluation, David gave plaintiff an Action Plan. Exhibit 30 to Defendant's Memorandum (Doc. #55). The Action Plan anticipated that plaintiff would continue to perform high-level and important HR functions including legal and regulatory reporting and monitoring, payroll administration, ESOP reporting, monitoring and documentation, HR information and communications, and being the primary HR contact for radio and corporate employees. Id. The Action Plan, however, directed plaintiff to transfer certain HR responsibilities to Ellenberger and to provide her with needed "guidance, coaching and mentoring" and to be "proactive in teaching [Ellenberger] – not just waiting on her to ask questions/make

mistakes." Id.[10] The Action Plan stated that plaintiff had excellent attention to detail and understood how HR matters impacted Eagle and that she had the knowledge to be a leader and manager of HR functions. The Action Plan noted that the company could not continue to grow if she did not share her knowledge with "those who will be leaders in our company in the years to come." Id. The Action Plan instructed plaintiff to "perform more like a leader and manager" and to "adapt to bring out the best in our new and younger employees." Id. David testified that the reference to "younger employees" meant employees "younger than [plaintiff and himself]." David Depo. at 164. The Action Plans for Ellegood and Ellenberger did not refer to "younger employees" or to plaintiff's age.

On April 7, 2014, David gave plaintiff a spreadsheet with proposed raises for corporate staff.[11] On April 9, 2014, plaintiff showed David a spreadsheet with additional columns showing each employee's age, date of birth, and percentage raise from the preceding year's salary. David proposed to raise plaintiff's annual salary from $56,517.72 to $59,400.00 per year, a 5.10 percent increase. David proposed to raise Ellenberger's annual salary from $33,063.00 to $36,577.74, a 10.63 percent increase. David proposed to raise Clinkscales' annual salary from $27,040.00 to $31,200.00, a 15.38 percent increase. Plaintiff explained that she was getting a smaller percentage raise than younger employees. Plaintiff demanded that in addition to the proposed raise, she receive an additional $1,074.00 per year. In plaintiff's opinion, she should have received the additional amount because she had been busy with the purchase of new time and attendance software, the additional requirements imposed by the Affordable Care Act, 401k audits, the acquisition of

---

[10]     The Action Plan also directed plaintiff to develop a backup plan for payroll administration, if both plaintiff and Ellegood were absent when payroll needed to be processed.

[11]     The corporate staff consisted of plaintiff, Ellenberger, Ellegood, Andrea Clinkscales, Allen Dinkel, Yvonne Rodriguez, Kay Prediger and Debra Creamer. David made recommendations on compensation changes to Shorman, who made the final decision.

additional business and other HR duties.  After David discussed the issue with Shorman, he told

plaintiff that Eagle would give her the additional $1,074.00 in the form of a bonus, after she had

completed the revisions to the employee handbook and had accomplished her 2014 Action Plan

items.

Plaintiff told David that she would not accept the bonus structure and that she felt that Eagle

was discriminating against her because of age.  Plaintiff said that if Eagle did not meet her salary

demands, "I'm out of here."  David asked plaintiff to rethink her position, but she stated "I'm tired

of this shit" and left the building.

On April 9, 2014, no one told plaintiff that she was fired or that she was no longer employed

at Eagle.  Shorman testified that on April 9, 2014, Eagle had no plan or intent to terminate plaintiff's

employment and that Eagle was trying to find a way to make plaintiff happy by offering a raise and

a bonus.  During an interview, plaintiff told an investigator for the Equal Employment Opportunity

Commission ("EEOC") that she resigned because she was dissatisfied with her annual raise.

Plaintiff told the investigator that the bonus was not good enough and that she had told the company

to "take the job and shove it."  Defendant waited a week to give plaintiff time to return to work.  She

did not do so.  On April 17, 2014, Eagle sent plaintiff a letter stating that her employment ended on

April 9, 2014.

On April 9, 2014, after plaintiff had not returned to work, defendant promoted Ellenberger

to HR Director.  Ellenberger is currently 31 years of age.  Ellegood performs some of the duties that

plaintiff previously performed.

Plaintiff has not been employed since April 9, 2014.  When the Department of Labor

("DOL") interviewed plaintiff about unemployment benefits, she reported that she quit without

giving notice, that she felt that Shorman and David had undermined her and that she was not able

to do some of her duties very well.  Plaintiff later told the DOL that she quit because Eagle had discriminated against her because of age and gender.  After an evidentiary hearing, the Kansas Department of Labor determined that plaintiff had quit her job without good cause.

<u>Analysis</u>

Plaintiff asserts claims that Eagle (1) discriminated against her based on age, (2) retaliated against her based on complaints of age discrimination and (3) maintained a hostile work environment based on age.[12]  Eagle argues that it is entitled to summary judgment because (1) on plaintiff's age discrimination claims, she cannot show that she suffered any adverse employment action, that the circumstances of any alleged adverse action give rise to an inference of discrimination or that its reasons for any adverse action are a pretext for discrimination; (2) on plaintiff's retaliation claims, she cannot show that she suffered any adverse employment action, that a causal link exists between the alleged adverse action and any protected activity, or that its reasons for any adverse action are a pretext for retaliation; and (3) on plaintiff's hostile work environment claim, she cannot show that the environment was sufficiently hostile or abusive.[13]

---

[12]   On August 28, 2015, the Court sustained defendant's motion for summary judgment on plaintiff's claim of disparate impact.  <u>See</u> <u>Memorandum And Order</u> (Doc. #50)

[13]   Eagle also argues that plaintiff failed to timely exhaust her administrative remedies as to ADEA claims based on events before October 15, 2013 and KADEA claims based on events before March 4, 2014.  Plaintiff did not respond on this issue.  Eagle is entitled to summary judgment on this issue based on plaintiff's failure to respond.  Out of an abundance of caution, the Court has considered events before October 15, 2013 in evaluating the remaining portion of defendant's motion for summary judgment and finds that defendant is entitled to summary judgment on all remaining claims.

Eagle also claims that plaintiff failed to mitigate her damages.  Because the Court finds that defendant is entitled to summary judgment on each of plaintiff's claims, the Court need not reach this issue.

## I.      Age Discrimination Claims: Prima Facie Case

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on her ADEA claim, plaintiff must establish that age was a determining factor in the challenged decision.[14]   See Greene v. Safeway Stores, Inc., 98 F.3d 554, 557 (10th Cir. 1996). Plaintiff need not show that age was the sole reason, but she must show that age "made the difference" in any adverse employment action. Id. (citation omitted).  Plaintiff may meet this burden by direct evidence of age discrimination or by the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th Cir. 2000).  In this case, plaintiff does not argue that she has direct evidence of age discrimination.  Therefore, the Court analyzes her claims under the McDonnell Douglas burden-shifting framework.

Under McDonnell Douglas, plaintiff initially bears the burden of production to establish a prima facie case of discrimination.  411 U.S. at 802.  Generally, to establish a prima facie case of age discrimination, plaintiff must show that (1) she was a member of the protected age group, over age 40; (2) she was doing satisfactory work; (3) she suffered an adverse employment action; and (4) defendant filled her position with a younger person or other evidence provides an inference of discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Medlock v. United Parcel Serv., Inc., 608 F.3d 1185, 1191 n.5 (10th Cir. 2010); Rivera v. City & Cty. of

---

[14]      Because of their similarity, the Court uses the same criteria to evaluate ADEA and KADEA claims.  See Linnebur v. United Tel. Ass'n Inc., No. 10-1379-RDR, 2013 WL 3815865, at *3 (D. Kan. July 22, 2013); Spicer v. RadNet, Inc., No. 10-4024-KHV, 2011 WL 2148651, at *6 (D. Kan. May 31, 2011).

Denver, 365 F.3d 912, 920 (10th Cir. 2004).

If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.  See Reynolds v. Sch. Dist. No. 1, 69 F.3d 1523, 1533 (10th Cir. 1995).  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual, that is "unworthy of belief."  Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1165 (10th Cir. 1998) (citation omitted).

Eagle argues that it is entitled to summary judgment on plaintiff's age discrimination claims because she cannot show that she suffered adverse employment action.  Plaintiff asserts that she suffered the following adverse employment actions: (1) Eagle demoted her by removing some of her essential duties as HR Director and (2) Eagle constructively discharged her.  See Plaintiff's Response (Doc. #60) at 26-33; see also Pretrial Order (Doc. #51) at 4-5 (Eagle "removed duties from Plaintiff resulting in a demotion of Plaintiff's responsibilities" and she resigned rather than "endure Defendant's discrimination, retaliation, and demotion in job responsibilities").

The Tenth Circuit liberally defines the phrase "adverse employment action."  Jones v. Okla. City Pub. Sch., 617 F.3d 1273, 1279 (10th Cir. 2010).  Such actions are not limited to monetary losses in the form of wages or benefits.  Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998).  Instead, the Court takes a case-by-case approach and examines the unique factors relevant to the circumstances at hand.  Id.  Adverse employment actions include, but are not limited to, a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Hillig v. Rumsfeld, 381 F.3d 1028, 1032-33 (10th Cir. 2004) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).  A mere inconvenience or alteration of job responsibilities does

not constitute adverse action.  Jones, 617 F.3d at 1279.

### A.    Adverse Employment Action: Removal Of Job Duties

Plaintiff argues that by removing certain job duties, Eagle placed her at a "material disadvantage . . . in performing essential functions of human resources."  Plaintiff's Response (Doc. #60) at 26.  Plaintiff contends that Eagle demoted her by changing her job duties as follows:

1.    In January of 2014, Eagle assigned Ellenberger the following tasks: (a) starting immediately, to become the primary HR resource for new USA Communications employees in the broadband division; (b) by June of 2014, to become the primary HR resource on the 401k plan for all broadband employees; (c) by October of 2014, to become the primary HR resource on health insurance for all employees in the broadband division and (d) by December of 2014, to become the primary HR resource in all HR areas (other than payroll) for all employees in the broadband division.

2.    David continued to supervise Ellenberger even though Eagle gave her new assignments in the HR department and plaintiff previously had been the only HR employee.

Id. at 27-28.

Plaintiff has not demonstrated a genuine issue of material fact whether Eagle's assignment of certain HR duties to Ellenberger constituted a demotion or other adverse employment action.  In context, Eagle's work force grew significantly from some 100 employees in 1998 to some 275 employees by April of 2014.  David consulted with plaintiff to some degree about Ellenberger's title and duties.  David accepted plaintiff's suggestion that Ellenberger's title be an HR Assistant rather than an HR Specialist.  In addition, David limited the scope of Ellenberger's HR duties to employees in the broadband division.[15]  Plaintiff maintained her title as HR Director and her primary

---

[15]    The record does not reflect whether David limited Ellenberger's assigned duties based on his conversation with plaintiff or for some other reason.

responsibility in managing numerous HR functions.[16]  Plaintiff does not directly dispute that Eagle

needed an additional employee to help her with HR duties.  Although plaintiff disagreed with

Eagle's selection of Ellenberger and the fact that David would continue to supervise Ellenberger,

plaintiff has not shown how the assignment of duties significantly changed her responsibilities.[17]

In sum, plaintiff has not raised a genuine issue of material fact whether Eagle's reassignment of

certain duties constituted a demotion or other adverse employment action.[18]  See  Daniels v. United

Parcel Serv., Inc., 701 F.3d 620, 635 (10th Cir. 2012) (fact that employees prefer day shift

insufficient to show that assignment to night shift constitutes "significant change in employment

status or responsibilities"); Jones, 617 F.3d at 1279 (mere inconvenience or alteration of job

responsibilities does not constitute adverse action); Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926-

27 (8th Cir. 2007) (minor changes in duties or working conditions, even unpalatable or unwelcome

ones which cause no materially significant disadvantage not adverse action); Sallis v. Univ. of

Minn., 408 F.3d 470, 476 (8th Cir. 2005) (minor changes in working conditions that merely

---

[16]     Ellenberger did not assume management duties.  Instead, Eagle asked Ellenberger gradually to assume the duty of HR resource to employees in the broadband division as she learned about various areas such as the health and 401k plans.

[17]     In response to defendant's statement of facts and in her own statement of facts, plaintiff has referred to several incidents before January of 2014 in which she felt that Eagle had excluded her including (1) succession planning, (2) the ESOP conversion to a Sub-S corporation, (3) the change in drug testing vendors, (4) the handling of employee complaints at Eagle's radio station in St. Joseph and (5) the interviews and hiring of Moody, Unruh, Denton and Fields.  None of the incidents by themselves or together resulted in plaintiff assuming "significantly different responsibilities." Burlington v. Ellerth, 524 U.S. at 761.  As explained above, plaintiff retained her title as HR manager and suffered no decrease in salary because of the "reassignment" of these particular duties.

[18]     Plaintiff also argues that changes in employment that significantly affect an employee's future career prospects constitute adverse employment action.  Plaintiff's Response (Doc. #60) at 26 (citing Cooney v. Union Pac. R. Co., 258 F.3d 731, 734 (8th Cir. 2001)).  Plaintiff has not presented evidence on this issue or explained how the transfer of job duties affected future career prospects.

inconvenience employee or alter responsibilities not adverse action); Sanchez, 164 F.3d at 532 (lateral transfer with increased commute time did not constitute adverse action when transfer did not alter plaintiff's responsibilities, salary or benefits).  Cf. Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003) (transfer from job providing skilled technical assistance to meat-wrapping job suggested adverse employment action because reassignment resulted in de facto reduction in responsibility and required lesser degree of skill).[19]  The Court therefore sustains defendant's motion for summary judgment on plaintiff's allegation that the transfer of duties to others constituted a demotion or other adverse employment action.

### B.    Adverse Employment Action: Constructive Discharge

Plaintiff asserts that she suffered adverse employment action in the form of constructive discharge.   An employee who is not formally discharged from employment may still be constructively discharged if the employer, by its illegal discriminatory acts, has made working conditions so difficult that a reasonable person in plaintiff's position would feel compelled to resign. See Derr v. Gulf Oil Corp., 796 F.2d 340, 344 (10th Cir. 1986).  Essentially, plaintiff must show that she had "no other choice but to quit."  Yearous v. Niobrara Cty. Mem'l Hosp., 128 F.3d 1351, 1356

---

[19]    Plaintiff cites two cases to support her argument that removal of job duties was adverse employment action.  See Thompson v. City of Waco, 764 F.3d 500, 502 (5th Cir. 2014); Lavalais v. Vill. of Melrose Park, 734 F.3d 629, 634-35 (7th Cir. 2013).

In Thompson, defendant suspended three police detectives – plaintiff and two employees outside of the protected class.  764 F.3d at 502.  When they returned to work after the suspension, defendant imposed written restrictions on plaintiff's job duties as detective, so that he was essentially acting as an assistant detective.  Id.  Defendant did not impose any restrictions on the two employees outside the protected class who were returning from the suspension.  Id.  Here, Eagle did not impose any restrictions on plaintiff's authority as HR Director and she has not shown how Eagle treated her differently than similarly situated employees.

In Lavalais, defendant reassigned plaintiff, a police sergeant, to the night shift.  734 F.3d at 634-35.  As a result, plaintiff had significantly less supervisory authority because of fewer subordinate employees worked that shift.  Id.  Here, plaintiff did not supervise Ellenberger before Eagle assigned her new duties so she did not lose any supervisory authority.

- 19 -

(10th Cir. 1997).   The conditions of employment must be objectively intolerable; plaintiff's subjective views of the situation are irrelevant.   Sanchez, 164 F.3d at 534; see Yearous, 128 F.3d at 1356.

Plaintiff contends that she was forced to quit because Eagle removed the essential functions of her position as HR manager.   Plaintiff's Memorandum (Doc. #60) at 29.   In particular, plaintiff contends that the following facts are sufficient for a jury to conclude that Eagle constructively discharged her:

1.   From May of 2011 through December of 2013, Eagle excluded plaintiff from compliance in the recruitment process, scheduling of interviews and selection of Moody, Unruh, Denton, and Fields.

2.   In October of 2013, Eagle excluded plaintiff from selection and implementation of a new drug testing process for all employees.

3.   In November or December of 2013, after several employees at the St. Joseph radio station told plaintiff that the station manager and sales manager had marginalized and demeaned them, Shorman told plaintiff that the station manager would handle the situation and that plaintiff should send all emails about the situation to Shorman and David.

4.   In January of 2014, Eagle assigned Ellenberger the following tasks: (a) starting immediately, to become the primary HR resource for new employees in the broadband division; (b) by June of 2014, to become the primary HR resource on the 401k plan for all broadband employees; (c) by October of 2014, to become the primary HR resource on health insurance for all broadband employees and (d) by December of 2014, to become the primary HR resource in all HR areas (other than payroll) for all broadband employees.

5.   In January 2014, Eagle excluded plaintiff from selecting the individual to (1) be the primary HR Resource for new employees in the broadband division, (2) be the primary HR Resource regarding health insurance, (3) be the primary HR resource regarding the 401k plan; (4) be the primary HR resource for all employees in the broadband division; and (5) be the HR assistant.

6.   In January 2014, David continued to supervise Ellenberger even though

> Eagle gave her new assignments in the HR department and plaintiff previously had been the only HR employee.

Id. at 30-31.

Plaintiff has not raised a genuine issue of material fact whether she had no choice but to quit. As to Eagle's hiring of Moody, Unruh, Denton and Fields, plaintiff has shown that Gorman and David may have decided to hire the individuals even before other interviews were scheduled, but she has not explained how such conduct made her working conditions intolerable. Plaintiff did not directly supervise these individuals and even before Eagle hired Moody in 2011, plaintiff had not participated in interviews of all candidates.

As to the handling of employee complaints at the St. Joseph radio station, plaintiff has not shown that Gorman or David mishandled the complaints. Plaintiff argues that she was not allowed to do her job and address the complaints, but she concedes that she did not have supervisory responsibility over the St. Joseph radio market. Plaintiff was the HR director, but she has not shown that she was routinely involved in resolving disputes at every location where an employee felt humiliated and demeaned. In any event, plaintiff again does not raise a genuine issue of material fact whether Eagle's handling of the complaints made her working conditions intolerable.

Plaintiff contends that the assignment to Ellenberger of employee drug testing in October of 2013 and various other duties in January of 2014 constituted a demotion and made her working conditions intolerable. Plaintiff acknowledges that Eagle was a growing company and that management thought that an employee should be added to assist her in the HR department. Although plaintiff felt that Eagle should have included her more in the selection and supervision of the assistant, she has not raised a genuine issue of material fact whether Eagle's failure to do so made her working conditions intolerable. Plaintiff had some input in the process. In response to plaintiff's suggestion, David changed Ellenberger's title from HR Specialist to HR Assistant.

Likewise, after David talked with plaintiff, he limited Ellenberger's new HR assignments to broadband division employees only.[20]  As for supervision, plaintiff remained HR Director.  Although Ellenberger "reported" to David, she was essentially plaintiff's assistant on HR matters.  Plaintiff's Action Plan from April 1, 2014 directs plaintiff to be a "leader and manger of HR functions" and provide Ellenberger with needed "guidance, coaching and mentoring."  Exhibit 30 to Defendant's Memorandum (Doc. #55).

Viewing the evidence in a light most favorable to plaintiff, she has not shown that Eagle gave her significantly different job responsibilities such that she had no other choice but to quit.  Minor changes in work assignments in a growing company are not adverse employment actions and certainly do not create an intolerable working environment.  See Buboltz v. Residential Advantages, Inc., 523 F.3d 864, 870 (8th Cir. 2008) (reasonable person would not find removal of two job functions, with no corresponding decline in pay or benefits, intolerable), abrogated on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011); Snowden v. Adm. Kelso, No. CIV. A. 93-1393 PLF, 1996 WL 43549, at *4 (D.D.C. Jan. 31, 1996) (removal of "major functions and duties" are not type of continuous and pervasive racially discriminatory actions that could make workplace so intolerable that reasonable person would feel forced to resign).  Plaintiff's subjective view that Ellenberger was not qualified or that Ellenberger should report directly to her does not create a genuine issue of material fact whether the workplace was intolerable.  See Tran v. Trs. of State Colls. in Colo., 355 F.3d 1263, 1271 (10th Cir. 2004) (employee's distress at close monitoring not sufficient proof that workplace was objectively intolerable); Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857-58 (10th Cir. 2000) (plaintiff's subjective belief that co-employees

---

[20]     The record does not reflect whether David limited Ellenberger's new duties to the broadband division based on plaintiff's suggestion or for some other reason.

were isolating her irrelevant).

From the uncontested record, it appears that plaintiff primarily quit because Eagle would not increase her annual salary by $1,074.00, rather than as a bonus after she had completed certain action items.  Indeed, during an interview, plaintiff told an EEOC investigator that she resigned because she was dissatisfied with her annual raise.  Plaintiff told the investigator that the bonus was not good enough and that she had told the company to "take the job and shove it."  Plaintiff does not claim that the bonus conditions were themselves unreasonable or unattainable with ordinary effort, only that offering the money as a bonus rather than as salary was unfair.  Even viewing these facts in the light most favorable to plaintiff, no jury could find that a reasonable person in plaintiff's circumstances "would have felt compelled to resign as the only feasible option."  Rennard v. Woodworker's Supply, Inc., 101 F. App'x 296, 309 (10th Cir. 2004).  The Court sustains defendant's motion for summary judgment on plaintiff's allegation that Eagle constructively discharged her.[21]

Absent any viable claim that Eagle took adverse employment action against plaintiff, she cannot establish a prima facie case of age discrimination.  Accordingly, the Court sustains defendant's motion for summary judgment on plaintiff's claims of age discrimination under the ADEA and KADEA.

**II.      Retaliation: Prima Facie Case**

To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in

---

[21]      Plaintiff also asserts that Eagle's replacement of plaintiff with a younger employee constitutes an adverse action.  Plaintiff's Response (Doc. #60) at 23-24.  Eagle did not replace plaintiff until she voluntarily left the company.  As explained above, plaintiff has not shown a genuine issue of material fact whether she had no choice but to quit.  Accordingly, the fact that Eagle replaced plaintiff with a younger employee is not evidence of a separate adverse employment action.

protected opposition to discrimination; (2) she suffered a materially adverse action; and (3) a causal connection links the protected activity and the adverse action. Daniels, 701 F.3d at 638.

Eagle argues that it is entitled to summary judgment on plaintiff's retaliation claims because plaintiff cannot prove adverse action. Plaintiff asserts that she suffered the following adverse actions in retaliation for her complaints: (1) Eagle demoted her by removing some of her essential duties as HR Director, (2) Eagle constructively discharged her and (3) Eagle failed to investigate her complaints. See Plaintiff's Response (Doc. #60) at 33-40; see also Pretrial Order (Doc. #51) at 4-5 (Eagle "removed duties from Plaintiff resulting in a demotion of Plaintiff's responsibilities" and she resigned rather than "endure Defendant's discrimination, retaliation, and demotion in job responsibilities").[22]

In the context of a retaliation claim, a materially adverse action is one that might dissuade a reasonable worker from making or supporting a charge of discrimination. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010). The purpose is to separate actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts or their employers, from "petty slights, minor annoyances, and simple lack of good manners," which do not create such deterrence. See Burlington v. White, 548 U.S. at 68; Johnson v. Weld Cty., 594 F.3d 1202, 1216 (10th Cir. 2010). Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, although "a mere inconvenience or an alteration of job responsibilities will not suffice." Id. (citing Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004)).

---

[22]    Plaintiff argues that Eagle's lack of investigation and failure to take corrective action is "retaliation in itself." Plaintiff's Response (Doc. #60) at 34. The Court liberally construes plaintiff's argument to assert that lack of investigation is an adverse employment action.

### A.      Materially Adverse Action: Removal Of Job Duties

As explained above, plaintiff has not shown that Eagle's removal of various job duties involved a significant change in responsibilities or any monetary loss in the form of wages or benefits.  In addition, plaintiff has not shown any other circumstances which demonstrate a genuine issue of material fact whether the change in job duties would have dissuaded a reasonable worker in her position from raising a claim of discrimination.  See Unal v. Los Alamos Pub. Sch., 638 F. App'x 729, 745 (10th Cir. 2016) (because plaintiff did not shown transfer had negative consequences beyond mere inconveniences, transfer would not deter reasonable employee from engaging in protected activity); Tran, 355 F.3d at 1268 (reassignments not adverse because they involved no hardship to plaintiff other than requirement to develop new skills).

### B.      Materially Adverse Action: Constructive Discharge

For reasons stated above, plaintiff has not raised a genuine issue of material fact whether she had no choice but to quit.  Accordingly, she cannot rely on constructive discharge as a materially adverse action on her retaliation claim.

### C.      Materially Adverse Action: Lack Of Investigation

Plaintiff asserts that Eagle's failure to investigate her complaints and take corrective action constitutes a materially adverse employment action.  Ordinarily, unless an employer's failure to investigate an internal complaint leads to demonstrable harm, it is not considered retaliatory because it leaves an employee no worse off than before the complaint was filed.  Daniels, 701 F.3d at 640 (citing Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 721-22 (2d Cir. 2010)).  The Second Circuit has noted that a contrary rule would open employers to retaliation claims even where they failed to investigate because of a good faith belief that the complaint was meritless.  Fincher, 604 F.3d at 721-22.  Plaintiff asserts that the failure to investigate led to the removal of certain job

responsibilities, a demotion and ultimately a constructive discharge, but she has not raised a genuine issue of material fact whether Eagle's failure to investigate by itself might dissuade a reasonable worker from raising a discrimination claim. See generally McInerney v. United Air Lines, Inc., 463 F. App'x 709, 718 (10th Cir. 2011) (considering failure to investigate as evidence of pretext, not independent adverse action).

For reasons stated above, the Court finds that plaintiff has failed to meet her burden to show any materially adverse action on her retaliation claims. Accordingly, Eagle is entitled to summary judgment on plaintiff's retaliation claims under the ADEA and KADEA.[23]

## III.     Hostile Work Environment

Age discrimination can form the basis of a hostile-environment claim if (1) the employee was discriminated against because of age; and (2) the discrimination created a workplace so permeated with severe or pervasive intimidation, ridicule and insult, that it altered the employment conditions and created an abusive working environment. See Howell v. N.M. Dep't of Aging & Long Term Servs., 398 F. App'x 355, 359 (10th Cir. 2010) (citing MacKenzie v. City & Cty. of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005)). To withstand defendant's summary judgment motion, plaintiff must show that a rational jury could find harassment based on age and that the workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

---

[23]     Because plaintiff has not established a prima facie case, Eagle need not offer a legitimate non-discriminatory reason for each of the alleged adverse actions. Even so, in the alternative, Eagle seeks summary judgment on plaintiff's age discrimination and retaliation claims because she cannot show that its reasons for any adverse employment actions are a pretext for discrimination or retaliation. Eagle has offered its stated reason why it engaged in succession planning in 2012, but plaintiff has not alleged that succession planning itself was an adverse employment action. Eagle has not offered specific reasons on the alleged adverse actions such as the transfer of specific duties, so the Court does not address this potential alternative ground for summary judgment.

environment." MacKenzie, 414 F.3d at 1280 (quotation omitted).  In determining whether the alleged conduct was sufficiently severe or pervasive to constitute actionable age harassment, the Court considers the totality of the circumstances including (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the employee's work performance.  Id.  These factors are evaluated from both an objective and subjective perspective, i.e. whether the employee was offended by the work environment and whether a reasonable person would likewise be offended.  Id.; see Hernandez v. Valley View Hosp. Ass'n, 684 F.3d 950, 957 (10th Cir. 2012).

Plaintiff maintains that a reasonable jury could find a hostile environment based on the following conduct:

1.  In October of 2012, in response to the questionnaire to management on succession planning, (a) Hinrikus (who will be 70 years of age in 2020) responded that the sales team in 2020 should be "young, hungry, and better trained;" (b) Klimek (who will be 69 years of age in 2020) stated that for his replacement, Eagle needs to "identify or recruit quality young people, need to get younger people in our organization, we are an aging company;" and (c) Trotman (who will be 63 years of age in 2020) responded that the sales team in 2020 "will be younger and digitally savvy."

2.  After plaintiff complained about Shorman's age-related comments, David subjected her to "persistent intimidation."

3.  After plaintiff complained of age discrimination and after several employees at the St. Joseph radio station told plaintiff that the station manager and sales manager had marginalized and demeaned them, Shorman told plaintiff that the station manager would handle the situation and that plaintiff should send all emails about the situation to Shorman and David.

4.  As part of plaintiff's evaluation on April 1, 2014, her Action Plan instructed her to "perform more like a leader and manager" and to "adapt to bring out the best in our new and younger employees."  Exhibit 30 to Defendant's Memorandum (Doc. #55).  David explained that the recommendation for plaintiff to focus on "younger employees" meant that she was to focus on

employees "younger than [her and himself]."  David Depo. at 164.

Plaintiff's Response (Doc. #60) at 41-42.

As to the responses to the questionnaire on succession planning, plaintiff has not presented evidence that any of these responses were shared with other employees including her.  Even if she had known of the responses, they reflected the views of sales managers about the composition of their sales team in 2020.  The managers did not direct the comments at plaintiff and they did not have any supervisory authority over plaintiff as HR Director.

Plaintiff has not specifically cited any incidents of David's "persistent intimidation," but she apparently is referring to the following incidents: (1) after a meeting in August of 2013, David told plaintiff that she should have never called the meeting in the first place and he was verbally abusive to her and (2) in early 2014, he asked plaintiff to provide a written explanation why she wanted to attend an HR seminar before he would approve it.  Plaintiff has not shown that David verbally abused her on more than the one occasion or that his request for a written explanation about the seminar was inconsistent with his treatment of other employees.  In addition, the record reflects that David made favorable comments to plaintiff.  In October of 2013, when plaintiff asked David if the company was trying to push her out because of age or retaliation, David asked when was the last time Eagle had fired or dismissed an older employee and "[w]hy would we want to get rid of you?  You are supposed to be training [Ellenberger].  I want [Ellenberger] to be exactly like you."  Plaintiff Depo. at 186.  Plaintiff admits that she knew that David intended the statement as a compliment, even though she did not take it that way.  In April of 2014, when plaintiff demanded that she receive $1,074.00 as part of her salary in addition to the proposed salary increase, David consulted Shorman and agreed to provide the money as a bonus at the end of the year.  Plaintiff has failed to provide evidentiary support for her assertion that David persistently intimidated her.

As to the handling of employee complaints at the St. Joseph radio station, as explained above, plaintiff has not shown that Gorman or David mishandled the complaints. In addition, plaintiff has not shown how management's handling of the complaints created a hostile work environment.

As part of plaintiff's evaluation on April 1, 2014, her Action Plan instructed her to "perform more like a leader and manager" and to "adapt to bring out the best in our new and younger employees." Exhibit 30 to Defendant's Memorandum (Doc. #55). David explained that the recommendation for plaintiff to focus on "younger employees" meant that she was to focus on employees "younger than [her and himself]." David Depo. at 19-20. While David should have used more precise language about the names of the specific employees rather than using the phrase "younger employees," the comment by itself or in conjunction with the other circumstances of plaintiff's employment does not create a genuine issue of material fact whether defendant created a hostile work environment.

In her statement of facts, plaintiff has pointed to several comments by Gorman and David about "younger employees," but most of them were in the context of succession planning. The comments about "younger employees" were not sufficiently severe or pervasive to unreasonably interfere with plaintiff's work performance. Notably absent from plaintiff's allegations are any derogatory comments or ridicule of an explicitly age-related nature. At a meeting in June of 2013, some ten months before plaintiff left her job, Gorman stated that the company needed new ideas, needed to have new and younger employees and that if older employees felt like they were just bench warming and waiting for retirement, they should leave and get a different job. While Gorman's comments may have been unpleasant and plaintiff may have felt that they were directed

at her, she has not shown that they were so severe or pervasive that they interfered with her work performance or constituted a hostile work environment.

In sum, viewing the evidence in a light most favorable to plaintiff, plaintiff has not demonstrated a genuine issue of material fact whether her workplace was permeated with discriminatory insult sufficient to create a hostile work environment. See DeWalt v. Meredith Corp., 288 F. App'x 484, 495 (10th Cir. 2008); see also Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir. 2005) (two racially offensive remarks far short of "steady barrage" required for hostile environment claim). Accordingly, the Court sustains Eagle's motion for summary judgment on plaintiff's hostile work environment claim.

**IT IS THEREFORE ORDERED** that Defendants' Motion For Summary Judgment (Doc. #55) filed October 7, 2015 is **SUSTAINED**. The Clerk is directed to enter judgment in favor of defendant.

Dated this 9th day of December, 2016, at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

- 30 -